FALLON v. WORTHINGTON.
SAME v. O'DONNELL.

</div>

<div align="right">13  559<br>15a 491</div>

1. A VENDOR'S LIEN NOT AN INTEREST IN REAL ESTATE LIABLE TO SALE ON EXECUTION.— A vendor of real estate who enters into a subsequent contract with his vendee, whereby the trust-deed given to secure instalments of purchase money is released, a lien merely being reserved, has only a chose in action, and no interest in the land which can be subjected to sale on execution.

2. A VOID EXECUTION SALE MAY, UNDER PECULIAR CIRCUMSTANCES, CONSTITUTE AN ASSIGNMENT OF EQUITABLE INTERESTS IN REAL ESTATE.— Where a party obtains a judgment against a defendant after he has parted with his title to real estate, retaining, by a contract subsequently made, a lien for purchase money merely, and the plaintiff proceeds to levy upon and sell on execution all the right, title and interest, either at law or in equity, of the defendant in and to the land, while the sale would be void under ordinary circumstances, yet where both the defendant and the purchaser at

such sale are fully aware of their legal rights, and the defendant attends the sale and consents to the application of the proceeds to the satisfaction of the judgment, receives the surplus and demands the return of security given by him for the judgment debt, he will be estopped from denying the validity of the sale, and the same will constitute an equitable assignment or transfer to the purchaser of the defendant's interest in the property.

*First Case, Error to the District Court of Clear Creek County.*

*Second Case, Appeal from the Same Court.*

Messrs. L. C. ROCKWELL and LUKE PALMER, for plaintiff in error.

Messrs. T. J. O'DONNELL, HUGH BUTLER and C. S. WILSON, for defendant in error and appellee.

PATTISON, C. The questions presented in the above-entitled cases are practically identical. They were consolidated, argued and submitted together, and may be considered and decided as one case. The issue between the parties is clearly and well defined. Although many questions are suggested, only so much of the history of the litigation will be given as may be necessary to an understanding of the legal propositions upon which the rights of the parties depend.

December 10, 1880, Dennis Fallon sold and conveyed to R. Harry Worthington the Muscovite lode mining claim, situate in Cascade mining district, Clear Creek county, Colorado. The consideration of the sale and conveyance was the sum of $30,000, of which $5,000 was paid. For the balance of the purchase price eighty-four notes were given, eighty-three of which were for $300 each and one for $100. These notes were payable monthly. To secure their payment a trust-deed was given upon the premises conveyed. By the terms of the notes and trust-deed, payment was to be made from the proceeds of the property, no personal liability being assumed by Worth-

ington.    Under the conveyance Worthington entered into possession of and began working the property, and from the proceeds paid two of the notes.    Afterwards, and prior to May 11, 1881, the parties entered into the agreement out of which this controversy arose.    The trust-deed, which has been mentioned, was released and discharged, and the agreement substituted therefor.

As the rights of the parties are dependent in some measure, if not wholly, upon the construction and legal effect of this instrument, it is here recited: "This agreement, made and entered into this 11th day of May, A. D. 1881, by and between R. Harry Worthington, of the county of Arapahoe and state of Colorado, party of the first part, and Dennis Fallon, of the county of Clear Creek, in said state, party of the second part, witnesseth: That whereas the said Dennis Fallon has a claim against and upon the Muscovite lode mine or mining claim, situate in Cascade mining district, county and state last aforesaid, owned by R. Harry Worthington aforesaid, said claim amounting to the sum of $25,000, therefore, in consideration of the premises, and of $1 to him in hand paid, the said R. Harry Worthington, for himself and his heirs and assigns, does covenant and agree to and with the said Dennis Fallon to proceed to the organization of a mining company, and to convey to said mining company, so to be organized by him, upon its organization, the said Muscovite lode, upon condition that the said company, so to be organized as aforesaid, shall proceed to work and develop said Muscovite lode, and from the proceeds thereof, except as hereinafter provided, pay or cause to be paid to the said Dennis Fallon, or to his use, the said sum of $25,000, with interest thereon at the rate of five per cent. per annum; it being herein and hereby understood that the expenses of organizing said company so to be organized, as aforesaid, shall not be charged against said mine or its proceeds, but that the same shall be wholly borne and satisfied by said

Worthington or said company. And the said R. Harry Worthington agrees to prosecute immediately the work mentioned in a certain contract, made by him with said Dennis Fallon, bearing even date herewith, and to furnish the money to pay for the same without reference to the organization of said proposed company, and whether the same shall be organized or not, and to devote all the net proceeds thereof to the payment of said indebtedness to said Fallon until the same shall have been wholly paid and satisfied.

"And the said Dennis Fallon, in consideration of the covenants and agreements aforesaid, to be kept and performed by the party of the first part, and of $1 to him in hand paid, does herein and hereby covenant and agree for himself, his heirs and assigns, that the said R. Harry Worthington, his heirs and assigns, may work all of said Muscovite lode or mine east of a point one hundred feet, surface measurement, below the lower drift, as at present established, and below an imaginary line running or drawn upon said lode or vein, and the length thereof from said point one hundred feet below the lower drift, as aforesaid,— the same to be worked by said Worthington or his assigns at his or their sole expense, and not at the expense of any profits that may arise from the working of the remainder of said lode, being above said point; and all profit that may be derived from said work, so to be carried on at the sole expense of the party of the first part, and from the portion of the lode or vein first aforesaid, shall belong solely to, and be the property of, said party of the first part or his assigns, and shall not be liable to be applied to the payment of the indebtedness due said Fallon as aforesaid.

"And the said R. Harry Worthington does covenant and agree that he will cause said Dennis Fallon to be engaged as superintendent of such work as shall be carried on by the company herein proposed to be organized, after the expiration and completion of the contract hereinbefore

referred to as of even date herewith, upon that portion of said lode or vein herein made liable for the indebtedness aforesaid, at a monthly salary at the rate of $1,000 per annum; the said Fallon agreeing upon his part faithfully and well to perform the duties of such superintendent for the best interests of said proposed company.

"And it is herein and hereby mutually agreed that for the payment of the money herein provided to be paid, as herein in manner and form provided for, the said Dennis Fallon shall have and is hereby given a lien upon said mine; he, the said Dennis Fallon, herein and hereby expressly waiving and releasing the said R. Harry Worthington and his assigns from all claim and demand therefor or by reason of anything contained herein, except to the extent of the property of the party of the first part or his assigns in said lode or mine."

To this instrument an addition was made upon the following day, called an "addendum," which is as follows: "After the completion of said contract, the prosecution of the work on said mine, and the method thereof, under the superintendence of said Fallon, shall depend upon the will and pleasure of said Worthington, being reasonably exercised: provided the same does not operate in defeating said Fallon in obtaining the amount of his lien against said mine in a reasonable time and under reasonable circumstances. The said Worthington or the said company not being able to furnish the money to prosecute the work will be sufficient reason for not prosecuting the same on said mine."

The contract and the addendum were each duly signed, sealed, acknowledged and recorded.

The contract referred to in this instrument provided for the driving of a drift or tunnel upon the property, upon certain terms therein stated. As nothing was done under this contract, it need not be further considered.

The suit was begun September 11, 1882. Very little had been done under the contract by either Worthington

or Fallon. The drift had been driven under a contract with a third party, but whether mineral was found or proceeds realized does not appear. Worthington did not organize the mining company, and did not employ Fallon as superintendent, as required by the contract. These omissions and other things were alleged as violations of the agreement, and the relief asked was that Fallon be adjudged to have a lien upon the property for the sum of $25,000, with interest as provided by the contract; that Worthington be ordered to pay said sum within a reasonable time; and that, in default of payment, the property be sold, etc.

The only defense interposed which requires consideration arose out of the following transactions: In September, 1881, Charles R. Fish recovered a judgment against the appellant for about $1,900, and caused an execution to be issued and delivered to the sheriff of Clear Creek county. The sheriff levied the execution upon all the right, title and interest of Fallon in the Muscovite lode, either in law or in equity, and also "upon all the right, title or interest, either in law or in equity, of said Dennis Fallon in and to the Muscovite lode mining claim that he now has or claims by virtue of certain agreements made and entered into by and between R. Harry Worthington and said Dennis Fallon, on the 11th day of May, A. D. 1881, and recorded," etc.

Under this levy the property was advertised and sold to O'Donnell for the sum of $2,140, which sum was duly paid by him to the sheriff on the day of the sale.

It appears that appellant was advised of the levy and of the sale to be had under it; that his attorney was present at the sale; that neither Fallon nor his attorney made any objection or protest, either before or at the time the sale was made; that the money paid by O'Donnell was applied in satisfaction of the judgment and costs, leaving a small surplus of about $15; that some time after the sale Fallon, either in person or by attor-

ney, demanded and received from Fish, or his attorney, certain notes and a trust-deed which had been deposited with Fish as a collateral to secure payment of the note upon which the judgment was recovered; that his attorney afterwards applied to the sheriff for the surplus of $15; that that sum was applied in payment of a sheriff's bill then outstanding against Fallon, with the consent of the attorney and the subsequent acquiescence of Fallon; that Fallon never redeemed, nor offered to redeem, from the sale, and deeds in due form were executed and delivered to O'Donnell after the equity of redemption had expired. Under these deeds O'Donnell claimed to be the owner of the interest of Fallon, not only in the property itself, but in the contract entered into between Fallon and Worthington. This was the situation of the parties at the time the bill was filed.

O'Donnell was made a defendant to the bill, on account of the interest claimed by him under the conveyance made by the sheriff, and set up as a defense the transactions which have been recited.

Worthington alleged, among other things, that Fallon was without interest in the contract or in the property, having been divested of all interest by the sale under execution. This was the only issue tried by the court. The court found the facts as to the recovery of the judgment by Fish, the issuance of execution, the sale of the property, and the conduct of Fallon and his attorney, as above stated. Upon these findings the decree was predicated. It was adjudged that by virtue of the sale O'Donnell became the owner of all the right, title and interest of Fallon in the property, whether existing by virtue of the contract or otherwise; that O'Donnell was entitled to be substituted for Fallon to all his right, interest and estate under the said agreement; and that the plaintiff had no cause of action against the said Worthington," etc.

Can this decree be sustained? This question presents

two propositions: *First.* Was Fallon vested with an interest in the property, subject to seizure and sale under execution? *Second.* If he was not seized of such an interest, then did his conduct prior to, at the time of, and subsequent to the sale work an estoppel, or *quasi* estoppel, by acquiescence, election or otherwise?

Section 1835, General Statutes, declares that "all and singular the goods and chattels, lands, tenements and real estate of every person against whom any judgment shall be obtained in a court of record, * * * shall be liable to be sold on execution;" and that "the term 'real estate' in this section shall be construed to include all interest of the defendant, or any person to his use, held or claimed by virtue of any deed, bond, covenant or otherwise, for a conveyance, or as mortgagor of lands in fee, for life or for years." Under this provision it is clear that if appellant was vested with any interest in the property, either legal or equitable, then such interest was liable to seizure and sale under the execution. It must appear, however, that the interest was a vested interest, which attached to the body of the land itself, and was held by him under a legal or equitable title, within the meaning of the law. Such an interest can only be predicated upon the provisions of the contract upon which this suit was brought.

It appears that in December, 1880, Fallon conveyed the property in question. The deed is not contained in the record, but it may be assumed that it was in the usual form, and that upon its delivery Worthington was vested with the title to the premises in fee. That conveyance was in full force at the time the contract was made. If Worthington conveyed or Fallon acquired any title, interest or estate in the property, either legal or equitable, it was by force of the contract. It is first necessary, therefore, to consider and determine the legal effect of this instrument.

The contract first expressly recognizes Fallon's claim

upon the mine to the amount of $25,000, and Worthing-
ton's ownership of the property.   The intent of the par-
ties is clear and unmistakable.   The object sought to be
attained by Fallon was security for the amount of his
claim, and its final payment out of the proceeds of the
property.  Worthington desired to accomplish this object
without incurring personal liability.   The agreement ob-
ligated him, or the company which he might organize,
to devote the net proceeds realized from a certain part of
the property to the payment of Fallon's claim.   Fallon's
claim was made a charge upon the property.  The agree-
ment to employ Fallon as superintendent, and to provide
money for a drift, were independent personal covenants.
The real purpose and chief object of the instrument was
to secure application of the net proceeds to the payment
of Fallon's claim.   To secure such application it was
"mutually agreed that for the payment of the money
herein provided to be paid, as herein in manner and form
provided for, the said Dennis Fallon shall have, and is
hereby given, a lien upon said mine."

Extraordinary and unusual as are its terms, it seems
clear that, under the contract, it was the duty of Worth-
ington, either by himself or through corporate organiza-
tion, to develop and work the property with reasonable
diligence, and, if proceeds were realized, to devote the
same to the payment of Fallon's claim.   If the property
was barren, Fallon would have no right of action.   If
proceeds were realized which Fallon might properly
claim, and such proceeds were appropriated by Worth-
ington, or by the company organized by him, then Fal-
lon would have a right of action for breach of contract,
in the enforcement of which he might resort to the lien
created by the agreement.   The contract, therefore, must
be construed to be a personal contract, providing for a
specific lien upon the property for its enforcement.   The
entire legal title was in Worthington.   He was in pos-
session of the property.   Fallon reserved no interest or
estate in the land whatsoever.   There was no defeasance

provided for by forfeiture or otherwise. Fallon's right, under the contract, was a chose in action, to enforce which he had a right to a lien.

No extended discussion of the nature of the lien is necessary. It was defined by the parties themselves. It was a lien by contract — an equitable lien. "An equitable lien arises either from a written contract, which shows an intention to charge some particular property with a debt or obligation, or is declared by a court of equity, out of general considerations of right and justice, as applied to the relations of the parties and the circumstances of their dealings." 1 Jones, Liens, § 27. A lien necessarily excludes any idea of ownership by the party claiming it. "A lien, whether implied or by contract, confers no right of property upon the holder. It is neither *jus ad rem* nor *jus in re*. It is neither a right of property in the thing, nor a right of action for the thing. It is simply a right of detainer. 'Liens are not founded on property,' says Mr. Justice Buller [*Lickbarrow v. Mason*, 6 East, 21, 24], 'but they necessarily suppose the property to be in some other person, and not in him who sets up the right.' Consequently the interest of the lienholder is not attachable, either as personal property or as a chose in action." Id. § 10.

The same author, at section 28, says: "Equitable liens do not depend upon possession, as do liens at law. Possession by the creditor is not essential to his acquiring and enforcing a lien. But the other incidents of a lien at common law must exist to constitute an equitable lien. In courts of equity the term 'lien' is used as synonymous with a 'charge' or 'incumbrance' upon a thing, where there is neither *jus in re* nor *ad rem*, nor possession of the thing. The term is applied as well to charges arising by express engagement of the owner of property, and to a duty or intention implied on his part to make the property answerable for a specific debt or engagement."

Under the contract the only interest which Fallon re-

tained in the property was the right to a lien to enforce its provisions. It necessarily follows that he had no interest in the property itself, and that no right, title or interest was vested in him, either under the contract or otherwise, which was subject to execution. Nothing, therefore, was seized under the writ of execution, and in law nothing passed to O'Donnell by the sale. "It is always indispensable that the property sold should be subject to the license, decree or writ under which the sale is made. * * * If property of the defendant is sold, it must be subject to the execution levied upon it, or the proceeding will be entirely inoperative upon his title." Freem. Jud. Sales, § 35. "If property is not subject to execution, a levy thereon, and a sale thereof based on such levy, are utterly void." Freem. Ex'ns, § 109. In the light of these principles, the conclusion is irresistible that the sale under which O'Donnell claims to be entitled to the rights of appellant under the contract was utterly void.

The question which remains to be considered is whether the conduct of appellant, prior to, at the time of, and subsequent to the sale, was such as to make it inequitable for him to take advantage of this void proceeding.

It is a well-settled elementary principle that a void judicial sale is an exception to the rule that "a confirmation or ratification cannot strengthen a void estate." Freem. Void Jud. Sales, § 50, and cases cited. This exception, however, has ordinarily been applied to cases in which the sale was void because of some irregularity in the proceeding or in the judgment under which it was made, rather than to cases in which the property attempted to be sold was not subject to execution. No case has been found in which the facts are either parallel or analogous with the facts in this case. It would seem, however, that this rule might well be applied to all void judicial sales, without reference to the reasons or principles upon which their invalidity is predicated.

The rule is based upon the beneficent principles of equitable estoppel. May it not be applied to this case if the right of Fallon, under the contract, is assignable, either by his own act or by operation of law? As has already been stated, the right secured to him was in the nature of a chose in action, upon which suit might be maintained by him whenever Worthington or his assigns should realize proceeds from the property properly applicable to his claim, and refuse to deliver them to him. Having neither title to the property nor its proceeds a legal or equitable action would be his only remedy.

That a chose in action, whether dependent upon a contingent or an absolute covenant or promise, is assignable, cannot be controverted. The question then is whether, under the circumstances of this case, the sale, in connection with the conduct of the parties, did not constitute an equitable assignment or transfer to O'Donnell of Fallon's interest, under his agreement with Worthington?

It is true that the ordinary elements of an estoppel *in pais* are not present in this transaction. These elements are clearly defined in *Griffith v. Wright*, 6 Colo. 248. There was neither misrepresentation nor concealment of material facts upon which O'Donnell was induced to act. On the contrary, O'Donnell had full knowledge of all the facts, for it appears that he prepared the contract between the parties. It further appears that Fallon's attorney participated in the negotiations which led up to the agreement, and was fully advised of its contents. The parties, therefore, must be deemed to have acted with full knowledge of their rights in the premises. This being the case, in view of the fact that Fallon and his attorney knew .that the levy had been made, knew what was intended to be sold, were present at the sale, consented to the application of the proceeds to the satisfaction of the judgment, received the surplus, and demanded other collateral which had been pledged for the payment of the debt, it cannot be doubted that Fallon

acquiesced in the sale. During all the interval between the levy and the sale he had full opportunity to protest against it. Had he done so, and had O'Donnell, in spite of his protest and against his objection, paid the money to satisfy the judgment, then he would have been a mere volunteer, and the proceeding would have been held to be without force or effect. The case is one, therefore, in which a party has changed his position through the failure of another to exercise a right which he might have exercised. The principles of estoppel by acquiescence or election are clearly applicable. "Wherever the right of other parties have intervened, or the rights of the party alleging the estoppel have been otherwise affected by reason of a man's conduct, or acquiescence in a state of things about which he had an election, and his conduct or acquiescence, or even laches, was based on a knowledge of the facts and of his rights, he will be deemed to have made an effectual election, and he will not be permitted to disturb the state of things, whatever may have been his rights at first." Bigelow, Estop. (4th ed.) 651. "In like manner, if one, without actually inducing another to act in a particular way, assent to the thing done, and seek to derive benefit from it, he cannot, in case of disappointment, deny the validity of the act assented to." Id. 661. The correctness of these principles has been recognized by this court in *Yates v. Hurd*, 8 Colo. 349. Freeman on Void Judicial Sales, at section 50, says, among other things: "These sales may be ratified either directly, or by a course of conduct which estops the party from denying their validity. Thus if the defendant in execution, after a void sale of his property has been made, claims and receives the surplus proceeds of the sale, with a full knowledge of his rights, his act must thereafter be treated as an irrevocable confirmation of the sale." Again, in the same section, he says: "Perhaps it is not essential that the defendant in execution should have directly received any part of the proceeds of

the sale. If he knows of the sale, makes no objections thereto, and permits the proceeds to be applied to the payment of his debts, he will, at least in Pennsylvania, be precluded from denying its validity." In *Smith v. Warden*, 19 Pa. St. 425, it is held that "equitable estoppels * * * have place as well where the proceeds arise from sale by authority of law as where they spring from the act of the party. * * * The application of this principle does not depend upon any supposed distinction between a void and voidable sale." The same proposition is clearly decided in *Deford v. Mercer*, 24 Iowa, 118; *Maple v. Kussart*, 53 Pa. St. 349; *McConnell v. People*, 71 Ill. 481. These principles are clearly applicable to this case.

As the findings of the court were abundantly sustained by the evidence, it follows that the decree based thereon was correct, and should be affirmed.

REED and RICHMOND, CC., concur.

PER CURIAM. For the reasons stated in the foregoing opinion the judgments are affirmed.

*Affirmed.*