THE ATLANTIC TRUST COMPANY v. THE CARBONDALE COAL COMPANY, et al., Appellants.

**Mechanic's Lien:** COLLATERAL SECURITY. A railroad company agreed by letter, to build a spur from its track to defendant's coal mine, taking defendant's note for the cost thereof. In the letter the railroad company stated: "We *may* require the president of the coal company to indorse the note personally." *Upon the completion of the spur*, the note was given, and on the request of the railroad company, it was signed by the president of the coal company. *Held*, that it was not a taking of collateral security which would defeat the railroad company's lien for work and materials furnished, under McClain's Code, section 3310, providing—that no person shall be entitled to a mechanic's lien, who, during the progress of the work, shall take any collateral security, but that the taking of security *after the completion of the work* shall not affect such rights.

**Assignment:** EQUITABLE LIEN. A coal company, in consideration of advances for its pay roll, agreed that all its accounts for coal sold should be assigned to the bank. At the request of the bank it was agreed that the accounts should be put under the control of the bookkeeper of the coal company, who should pay the money into

4  bank when collected.  *Held*, that the bank thereby acquired a lien
   on the accounts, entitling it to the amount collected thereon,
   which reached the hands of a subsequently appointed receiver of
   the coal company.

*Appeal from Polk District Court.*—HON. S. F. BALLIET,
Judge.

FRIDAY, OCTOBER 16, 1896.

THIS action was commenced against the Carbon-
dale Coal Company for the foreclosure of a mortgage
given to secure certain bonds executed by the com-
pany. The petition also asked the appointment of a
receiver, and R. E. Sears was appointed, and is now
such receiver, and is a party and appellant in the suit.
The Polk County Savings Bank, the Laflin & Rand
Powder Company, the Iowa Coal Land Company, the
Chicago, Rock Island & Pacific Railway Company, and
others intervened. Of the interveners named, the
Laflin & Rand Powder Company, the Iowa Coal Land
Company, and the Chicago, Rock Island & Pacific
Railway Company appealed from the orders and judg-
ment of the district court, as did also the Carbondale
Coal Company and Sears, receiver. Since the appeal,
by a stipulation filed, the Carbondale Coal Compay,
Sears, receiver, and the Iowa Coal Land Company have
dismissed their respective appeals, and consented to
an affirmance of the judgments appealed from in all
particulars; each of said parties having paid costs as
stipulated. The questions remaining to be considered
on this appeal arise on the claims of the Chicago, Rock
Island & Pacific Railway Company, intervener, and
the Laflin & Rand Powder Company, appellant, and the
Polk County Savings Bank, appellee.

The Carbondale Coal Company was engaged in
mining and shipping coal. For the purpose of its
business, it constructed a railway track from its mines

to the line of road belonging to the Chicago, Rock Island & Pacific Railway Company, and, under contract with the coal company, the railway company furnished labor and material for the construction of said track, of the value of seven thousand, two hundred twenty-six dollars and seventy-five cents. In its petition of intervention, it asks judgment for that amount, and the establishment of a mechanic's lien on the property, which is described. The district court gave judgment for the amount claimed, but denied the lien. The appeal by the railway company is from the order refusing the lien. The Laflin & Rand Powder Company is a judgment creditor of the Carbondale Coal Company, in the sum of one thousand, three hundred and sixty-eight dollars and fifty cents, with interest and costs. On the twenty-third day of June, 1893, a writ of attachment issued at its instance, and, by leave of court, the receiver of the coal company was garnished, by virtue of which the powder company claims that certain moneys held by the receiver, collected on accounts owing the coal company before his appointment as receiver, should be applied to the payment of its judgment. The claim of the Polk County Savings Bank is substantially as follows: In 1892 the coal company was doing its business with said bank. The company had not money in the regular course of its business, to meet its pay rolls. Its accounts for coal sold were not due or realized on, so as to supply the money, and the president of the company arranged with the bank to advance the money to pay off the rolls, and pledged the accounts of the company, present and future, for the repayment of the amounts so furnished by the bank. By virtue of this agreement, money was furnished, so that, at the filing of the petition by the bank, there was due it the sum of four thousand, seventy-five dollars and sixty-nine cents. It appears from the petition, that at

the appointment of the receiver, there came into his hands, of accounts, so pledged, or money collected on such accounts, the sum of four thousand, seven hundred and forty-seven dollars and thirty-six cents; and it asks that so much thereof as is necessary, be applied to the payment of its account against the coal company. The Laflin & Rand Powder Company expressly denies and resists the claim of the bank to the application of the accounts or money. The district court sustained the claim of the bank, and the powder company appealed.

*Cummins & Wright* for appellant Chicago, R. I. & P. Ry. Co.

*Berryhill & Henry* for appellant Laflin & Rand Power Co.

*Earle & Prouty* for appellees Polk County Savings Bank, *et al.*

GRANGER. J.—I. The ground on which the claim of the railway company to a lien is resisted is that the company took collateral security, so as to defeat the right to such a lien, under McClain's Code, section 3310, as follows: "No person shall be entitled to a mechanic's lien who, at the time of executing or making the contract for furnishing material or performing labor, as hereinafter provided, or during the progress of the work, erection, building or other improvement, shall take any collateral security on such contract. But after the completion of such work, and when the contractor or other person shall have become entitled to claim, or have a lien, the taking collateral or other security shall not affect the right to such mechanic's lien, unless such new security shall be by express agreement given and received in lieu of the mechanic's

lien." The facts relied on as showing the taking of collateral security are shown by the following evidence: R. E. Sears testifies: "The contract with the Rock Island road was partially by correspondence, and partially oral. The oral communication was with Mr. Kimball, superintendent of the road, and also the correspondence. I called on Mr. Kimball, at Davenport, and stated my desire to have him furnish the material for the side track. Mr. Kimball referred me to Mr. Cable, the president. Mr. Cable was not at home, but in a few days I received a letter from him. The following is the letter that I received from Mr. Cable: 'Regarding the track to reach coal mine, this company will furnish material for a mile and a half track, and take notes of the company for this material. The company may require the notes to be indorsed by you personally.' I did indorse the notes personally. They were given for that material furnished by the railroad company. The railroad company still holds the notes of the Carbondale Coal Company. They are not paid. After the receipt of that letter, the railroad company proceeded to furnish the material and do the labor. I have made a careful examination of all my papers, letters, and copies of letters, but I cannot find any response to that letter. The material was furnished and work done; and, when it was all done, I gave the company's notes, indorsed by myself, for the amount. I think I signed the notes on the face with the company, in place of indorsing them. I do not remember anything more about any agreement except as is stated in this letter."

If it be conceded, for the purposes of the case, that the signing of the note was the taking of collateral security, which we do not decide, the query arises, was it so taken as to defeat the lien? The statute expressly permits the taking of such security

after the work is completed, and the contractor is entitled to claim or have the lien. There is no claim that this was taken in lieu of the lien.

The notes were not given until the materials were furnished and the work all done. Aside from the question of security, the company was then entitled to claim and have the lien. In order, therefore, to defeat the lien, there must have been security before the giving of the notes. There was no security before, nor even an agreement for security. With the most liberal construction of the letter, and its treatment, in favor of the coal company, it was but an agreement to indorse the notes if asked to do so when taken. We do not say that such is a necessary or even proper construction. But that is all that can be said. The word "may" does not express a present intention to require the indorsement. The legitimate inference is from the language of the letter, and furnishing of work and materials without an answer, that "we will furnish them, and we *may* require you to indorse the notes." There was no security taken until the notes were executed. The case of *Bissell v. Lewis*, 56 Iowa, 231 (9 N. W. Rep. 177), is somewhat in point.

The argument makes a reference to the extent of the lien asked, but not in such a way that we feel called upon to deal with that question. We think the lien should have been established.

II. To arrive at the real understanding between the bank and the coal company in regard to the accounts involves the consideration of evidence more than can be set out in this opinion. In some parts of the evidence, and in the petition, different terms are used in a way, at times, to indicate a mere pledge of the accounts as security, and, at others, an absolute assignment of the accounts, "to be held absolutely and solely for the benefit" of the bank. One thing seems

certain throughout all the evidence and averments: that the accounts were to be set aside and collected for the use of the bank in·payment of overdrafts of money to discharge the pay rolls. The following is a part of the testimony of Mr. Sears, who was president of the coal company, and made the agreement with the bank: "Q. State what conversation you had with the officers of the Polk County Savings Bank, under which the money was advanced for the pay rolls of the miners. A. It was in the Polk County Savings Bank, in January or February of 1891. Part of the conversation was with Judge Wright and Mr. Zwart; the balance with Mr. Zwart alone. Mr. Frymier was present at the conversation with Mr. Zwart. The conversation was that we did not get our pay for the coal mined until about the 20th of the following month, and the men at the mine had to be paid the 1st of the month for the coal mined the preceding month; and that we needed money for the pay rolls. And I stated after that that if they would advance the money for the pay rolls, that we would transfer to them the accounts standing on the books for the coal sold during the preceding month; and after some discussion in regard to it, the details of which I have forgotten, that was agreed to. That was the conversation with Judge Wright. Then, as we went into the banking room proper, I asked Mr. Zwart if I should have the accounts made out and signed over to him, or rather suggested that I would have that done. Mr. Frymier stood at the desk of the banking room. Zwart stated it would be too much bother to them to look after the collection of these accounts, and thought Mr. Frymier should collect them, and, when collected, turn them over to them. I stated to him that, if that was satisfactory to them, it was to us, and we should have it done. This arrangement continued as long as they ·advanced

money to meet the pay rolls. I don't remember that anything was said as to how the accounts should be kept. We were to assign the accounts over to them as security for the overdraft." There is considerable other evidence, but nothing to change the conclusion deducible from that quoted, but much in aid of it. Our conclusion is that the parties understood that the accounts were to be taken by Frymier and collected for the bank, and the money deposited to the credit of the company on its account for money advanced to discharge the pay rolls. There is little, if any, difference whether it is called an assignment, or a pledge as security. It was an agreement to place the accounts in the hands of Frymier, who was bookkeeper for the coal company, for collection, in such a way that the coal company had no right to control them. The cashier of the bank, in his testimony, speaking of the offer to make the assignment in writing, said: "I told him I would prefer not to do it in that way, as it would be troublesome for us to collect it. I understood Frymier was doing the business in the office of the Carbondale Coal Company. If he had the understanding that the accounts belonged to us, and he would deposit the money with us, that would be sufficient. Frymier was present at the conversation." It is not an agreement to pay a debt out of a particular fund when collected. It is an agreement to set aside specific property out of which a debt is to be paid. The powder company cites Jones, Liens, sections 51-52. The sections refer to cases in which it is the intention that the owner retain the goods. Both sections support the claim of the bank, in so far as they bear on the question. Under the contract in this case, when the accounts were in the hands of Frymier, the coal company had no authority over them. It could in no way control them. It became the duty of Frymier to collect and

pay to the bank. See Jones, Liens, section 47. We have nowhere seen a case in support of appellant's contention, under the facts, as we find them. It should be said, that appellant views the conclusions of fact somewhat differently, and this difference may account for the reliance on authorities that we do not consider controlling. Our holding has support in *Gallinger v. Pomeroy,* 3 G. Greene, 178. In *Williams v. Ingersoll,* 89 N. Y. 508, it is said: "The form of words used in making the agreement is not alone to receive attention, but all the circumstances of the transaction are to be considered. It is a rule in equity, that anything which shows an intention to assign on the one side, and from which an assent to receive may be inferred on the other, will operate as an assignment, if sustained by a sufficient consideration." These words are especially applicable to this case, in view of the different expressions used in the negotiations. The real intention of the parties is not to us a matter of serious doubt. In 13 Am. & Eng. Enc. Law, page 608, it is said: "An equitable lien is a right, not recognized by law, to have a fund or specific property, or its proceeds, applied in whole or in part to a particular debt or class of debts. The great difference between the equitable and common law lien is, that the former is not conditioned upon possession of the things sought to be charged, while in the latter, as we have seen, that is absolutely essential. Every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund therein described or identified, a security for a debt or other obligation, or where the party promises to convey, or assign, or transfer, the property as security, creates an equitable lien upon the property so indicated, which is enforceable against the property in the hands, not only of the original contractor, but of his heirs,

administrators, executors, voluntary assignees, and purchasers, or incumbrancers, with notice. If the intention is apparent, the form of the contract is of small importance." On page 611 it is further said: "It is a general doctrine of equity that where a party, for a consideration, agrees to give certain security for the payment of a debt, the property, whether real or personal, will be considered a pledge for the satisfactio of such debt, the reason of this being that equity often treats as having been done that which ought to be done." These rules are sustained by abundant authority, and they seem to us conclusive of the question we are considering, under the facts as we find them.

Our considerations lead to the following conclusions: On the appeal of the Chicago, Rock Island & Pacific Railway Company, intervener, the judgment is reversed. On the appeal of Laflin & Rand Powder Company, intervener, it is AFFIRMED.