ATLANTA NAT. BANK et al. v. FOUR STATES GROCER CO.†

(Court of Civil Appeals of Texas. March 2, 1911. On Motion for Rehearing, March 23, 1911.)

1. RECEIVERS (§ 77*)—LIENS ON PROPERTY.

A mill company, owning a plant and wishing to remove it to a place where it owned timber, entered into an agreement with plaintiffs and defendant, its only creditors, that if they would extend the time of payment of the debts for four months, and a reasonable time thereafter, it would not give any creditor collateral security without the consent of such creditors, and would prorate among such creditors the profits from the mill in its new location, and if the mill proved unprofitable the creditors could close it down. The plant was removed, but the mill company lacked funds to operate and applied to plaintiff, representing that it could use merchandise to pay the operating expenses. Plaintiff, with the consent of the other creditors, furnished the goods upon the mill company's agreeing to give a first lien therefor on the lumber it might cut. The company cut a quantity of timber which it could not have cut without this assistance. The company went into a receiver's hands, and the receiver had money from the cut timber in excess of plaintiff's claim for the goods. *Held*, that plaintiff was entitled to a first lien thereon for the price of such goods.

[Ed. Note.—For other cases, see Receivers, Dec. Dig. § 77.*]

2. LIENS (§ 7*)—EQUITABLE LIEN—CONTRACT.

Every written contract which shows an intention to charge some particular property therein described or identified with a debt or obligation creates an equitable lien, and a written agreement to convey or transfer property as security for a debt creates an equitable lien, and a verbal contract will create such a lien on personal property.

[Ed. Note.—For other cases, see Liens, Cent. Dig. §§ 26–28; Dec. Dig. § 7.*]

3. INTEREST (§ 20*)—FUNDS IN LITIGATION—INSOLVENCY.

After the property of an insolvent passes into the hands of a receiver or an assignee in insolvency, interest is not allowed on the claims against the funds; the delay in distribution is the act of the law, and is a necessary incident to the settlement of the estate.

[Ed. Note.—For other cases, see Interest, Cent. Dig. § 41; Dec. Dig. § 20.*]

4. RECEIVERS (§ 163*)—CLAIMS—JUDGMENT—INTEREST—ADMISSIONS.

Where the court found that a certain sum and interest was due plaintiff, and directed the receiver to pay the same out of funds in his hands before any part of the fund should be applied to defendants' claims, that defendants did not object to the entry of the judgment including interest is not an admission that such interest was a proper charge on the fund.

[Ed. Note.—For other cases, see Receivers, Dec. Dig. § 163.*]

5. RECEIVERS (§ 163*)—CLAIMS—INTEREST.

The creditors of a mill company extended the time of payment of their claims to enable the mill company to move its plant to a more suitable location; the mill company agreeing that no creditor should be given collateral security without the consent of all parties to the extension agreement. After the removal of the mill, the mill company, requiring further credit, entered into an agreement with one of such creditors, a grocer company, with the consent of the other creditors, by which the grocer company extended further credit on condition that it should have a lien on all lumber cut to secure such additional credit. Thereafter the mill company went into the hands of a receiver. *Held*, that the grocer company was not entitled to interest on the amount of such additional credit payable from the proceeds of lumber sold by the receiver.

[Ed. Note.—For other cases, see Receivers, Dec. Dig. § 163.*]

Appeal from District Court, Cass County; P. A. Turner, Judge.

Action by the Four States Grocer Company against the Atlanta National Bank and others. From a judgment for plaintiff, defendants appeal. Affirmed.

O'Neal & Allday, for appellants. Glass, Estes, King & Burford, for appellee.

WILLSON, C. J. Appellants, the Atlantic National Bank, the First National Bank of Atlanta, and the Atlanta Lumber Company, and appellee, the Four States Grocer Company, are creditors of the Alamo Mills, a corporation, whose property was placed in the hands of a receiver by an order of the district court of Cass county made July 22, 1909. By an intervention in the receivership suit appellee obtained a judgment against said Alamo Mills for the sum of $7,828.48, due on certain promissory notes, and for the sum of $3,667.37, claimed by the grocer company to be due it on an open account against said mill company. The $3,667.37 was adjudged to be a lien on certain lumber belonging to the mill company, and to be entitled to priority of payment, as against appellants' claims, out of the proceeds of a sale of said lumber made by the receiver after he took charge of the property of said mill company. As found by the trial court, the facts were: Prior to October 16, 1908, the mill company owned a sawmill plant, situated near Atlanta, but owned no timber accessible to its mill. It wished to remove its plant to a site near Queen City, where it owned timber. It was indebted to appellants and appellee in sums it was unable to pay, but was not indebted to any one else. On said October 16, 1908, said mill company and appellants and appellee entered into an agreement as follows: "It is agreed: First. That each and all of the above-named creditors of said Alamo Mills agree to extend time of payment of their respective debts against the said Alamo Mills for a period of four months from this date, so as to enable said Alamo Mills to move its mill and put same in proper condition for operation. Second. Now if at the expiration of said four

months said Alamo Mills, from any provi-·dential or unavoidable hindrance, is unable to begin the liquidation of its said indebtedness, then and in that event we agree to extend the payment of said indebtedness for such reasonable additional time as may be necessary to enable said Alamo Mills to meet and pay off its said indebtedness to said ·creditors. Third. It is further agreed and understood that said Alamo Mills shall not give to any creditor any kind of collateral security for debt without the consent of each and all of the creditors mentioned in this agreement. Fourth. It is further agreed and understood that all money arising from the manufacture and sale of the products of the said Alamo Mills, after deducting all necessary current expenses of operation, shall be prorated between the creditors mentioned in this agreement, in accordance with the amount of their respective debts. Fifth. It is further agreed that, in case the price or ·demand for lumber should fall off so as to make it apparent that said Alamo Mills could not be successfully operated so as to pay off its said indebtedness, then, in that event, the ·creditors mentioned in this agreement shall have the right to stop the operation of said Alamo Mills until some further agreement is made for the payment of the indebtedness of ·said Alamo Mills to the said creditors. The Alamo Mills shall make monthly statements of its affairs and financial condition to said creditors or either one of them." The mill company removed its plant as was contemplated by the parties at the time the agreement was entered into, but for lack of means necessary to pay the expenses thereof was unable to operate the mill. It applied to certain of its said creditors for an advance of funds necessary to pay such expenses, but was refused such an accommodation. Afterward, between the latter part of December, 1908, and the 5th of January, 1909, it applied to appellee for assistance, representing to appellee that it could use goods, wares, and merchandise in paying the expenses of operating the mill. Appellee thereupon proposed to furnish it goods, wares, and merchandise to be so used, if it would secure the payment of the price thereof by a lien on the lumber to be cut by the mill, and agree that the sum to become due it for such goods should be a preference claim, to be first paid by the mill company out of the proceeds of the lumber to be cut by it. This proposition was accepted by the mill company. Thereafterwards appellee, on the faith of the mill company's undertaking, as evidenced by its acceptance of said proposition, furnished it goods, wares, and merchandise aggregating in value the sum of $3,519.77, which were used by said mill company in paying the expenses it incurred in operating said mill, enabling it, when it otherwise could not have done so, to cut 600,000 feet of lumber, which the receiver took possession of and sold, as

he was authorized to do by the order appointing him. The proceeds of such sale by the receiver were greatly in excess of the sum due appellee on said account, and were in the possession of the receiver at the time of the trial. The court concluded that appellee had a lien on said lumber for the payment of said account and was entitled to have same paid out of the proceeds of the sale of the lumber before anything was paid on the claims of appellants.

The principal contention made by appellants is that the finding of the trial court that appellee had a lien on the lumber cut by the mill was without evidence to support it. Cavin, appellee's manager, testified: "We agreed to furnish them (the Alamo Mills) goods, provided that we could collect our money before any of the past indebtedness commenced. We were to come in like the balance of the creditors for our notes. But the goods we furnished them were to be paid for first, out of the proceeds of the lumber." Willis, the cashier of the Atlanta National Bank, testified: "I understood an agreement to this effect: Tom Johnston, manager of the Alamo Mills, said, if he could just get some groceries for the men to live on, they were willing to work without any money until after he got started and began shipping lumber so that he could pay and liquidate his labor account first. The Russ Daniel Grocer Company (which afterwards became the Four States Grocer Company by an amendment of its charter, it seems) were also creditors, and he owed them between $4,000 and $5,000, perhaps, at the time. That was on the old score before they moved, at the Piney Grove Church. They owed Daniel, and the Four States Grocer Company, the successor to the Daniel Grocer Company, then said that they would furnish him some groceries and feed for the men, if the other creditors would be willing to let them pay them this current account; that is, after they moved and got started, before they paid anything else. On the old score the Daniel Grocer Company would come in like the balance of us, when they did get the money and prorate it like the other. Well, the creditors, as I understood it, agreed to this proposition. In other words, that the Russ Daniel Grocer Company will, again, now, furnish them some groceries to operate this mill on, and you can pay them this current account for the stuff they furnish you now, until it is all paid, before you pay the balance of the creditors any money; then on the old score, what they owed prior to this, they would come in like the balance of us and be prorated. * * * The First National Bank and the Atlanta National Bank and the Russ Daniel Grocer Company and the Atlanta Lumber Company were the main creditors. The way I remember it, these creditors were either there or represented there. They agreed to this arrangement; that is, if the

Russ Daniel Grocer Company would take the risk and furnish them they would be paid first. Now that payment was to come from the operation of the mill. * * * It was agreed between those that were there, and Tom Johnston for the Alamo Mills, and the Russ Daniel Grocer Company, now the Four States Grocer Company, that if any one would furnish this mill they should be paid first out of the cut from the mill when they began operation and began to liquidate. Tom Johnston was present as manager of the Alamo Mills."

[1] We are of the opinion that the testimony recited was sufficient to support the finding of the court that appellee was entitled to have its claim for the goods furnished paid out of the proceeds of the sale of the lumber before any part of said proceeds should be applied to the payment of the claims of appellants. It will be noted that, according to the findings of the court, the position of the parties before they entered into the agreement of October 16, 1908, set out above, was as follows: The mill company owned a sawmill plant which had to be moved from its site to another one where it had timber, before it could be operated. It was indebted to the other parties to the agreement, and not only was without means with which to pay such indebtedness, but was without means with which to pay the expense of moving its plant and afterwards operating same until it could realize from sales it might make of lumber it might manufacture. The other parties to the agreement were, it seems, without security for their claims against the mill company, and it may be inferred that whether they would be able to obtain payment in full of their respective claims, or not, depended upon whether the mill plant could be moved and then operated at a profit or not. Such being the situation, it seems that all the parties concerned reached the conclusion, and so agreed, that the mill should be moved and then operated solely for the benefit of said creditors until their respective debts had been paid out of the proceeds of sales of products of the mill. That this was the purpose of the agreement is shown by stipulations therein denying to the mill company a right, without the consent of all the other parties to the agreement, to use any of its assets for the purpose of securing any of its creditors, directing the use to be made of money which might be realized from the sale of products of the mill, conferring upon the creditors who executed the agreement a right to stop the operation of the mill, if it could not be profitably operated, and requiring the mill company to make to such creditors, monthly, statements showing the condition of its affairs. By their agreement the creditors in a sense became jointly interested in the operation of the mill, for the effect of the agreement, if carried out according to its terms, would be to have the mill operated for

the benefit of all of them alike, until their respective claims against the mill company had been fully paid out of funds realized from sales of lumber manufactured by it. That they contemplated that the expenses of operating the mill should be paid out of such funds before any of same should be applied to the payment of their debts is conclusively shown by the fact that they expressly so provided in the contract. The plant having been removed to the new site, as it was intended by the parties it should be, it still could not be operated because the mill company was without means to pay the expense of its operation. It appeared, therefore, that the purpose of the parties would fail of accomplishment if such assistance as would enable it to meet operating expenses was not furnished to the mill company. It was then that the manager of the mill company, after he had failed to procure such assistance from other sources, applied to appellee and received from it the aid which enabled it to do what all the parties to the agreement, when they made it, intended should be done; that is, to operate the mill for the benefit of the creditors who had executed the agreement. In other words, appellee supplied the means necessary to carry out as contemplated the plan all the parties had agreed upon as the one to be pursued to accomplish their common purpose, to wit, to operate the mill and out of funds realized thereby pay the mill company's indebtedness. From the testimony of Cavin and Willis it clearly appeared that it was understood and agreed between the mill company and appellee that the proceeds of sales of lumber manufactured by the mill should constitute a fund for the payment of the sum to become due the latter for goods, wares, and merchandise furnished by it. Appellants had expressly agreed that the payment of their claims out of such proceeds should be postponed until such expenses had been first paid. So it appeared that all the parties concerned were in the attitude of agreeing that the indebtedness claimed by appellee for furnishing means to operate the mill should become and be a charge on that fund. This, we think, created an equity in appellee's favor that the court had a right to enforce in the distribution of the funds in the hands of its receiver arising from a sale of the lumber manufactured by the mill company. All that was required to create such an equity was that "the intention of the parties, as deducible from the contract, be clear in its purpose to pledge the fund as a security for the debt created." Powell v. Jones, 72 Ala. 398.

There can be no doubt from the evidence that it was the intention of the mill company to charge the fund it expected to own from the operation of the mill with the payment of the indebtedness it had arranged to incur to appellee for the goods to be furnished for the purpose of operating the mill. There can be no doubt that appellee sold the

goods on the faith of the agreement that it should be paid out of that fund before any part of it should be applied to the payment of the other indebtedness of the mill company. There can be no doubt that the complaining creditors at the time they entered into the agreement of October 16, 1908, intended that the fund should be applied to the payment of the expenses necessary to be incurred in operating the mill, before any part of their respective claims should be paid out of such fund. Appellee's account being (admittedly, it seems) for goods used in meeting the expenses necessary in operating the mill, to deny to it the preference the court awarded to it would be to deprive it of a security it had a right by agreement of all the parties concerned to look to for payment for the goods furnished, and would be to confer upon appellants a right they by their contract had expressly waived in favor of any one who, as appellee did, might furnish to the mill company means with which to pay its current operating expenses. In the case cited above, the claim Powell sought to enforce was for certain moneys alleged to have been advanced by him to pay the expenses of himself and others appointed by the state of Alabama as commissioners to locate "swamp lands" appropriated to that state by an act of Congress. It was the duty of the commissioners to select and determine such "swamp lands," to make a report of their work to the Governor, and to procure patents from the United States in the name of the state for the benefit of the state. The compensation to be received by the commissioners was 20 per cent. of the amount realized by the subsequent sale of these lands, whenever disposed of by the state. The expenses to be incurred by the commissioners in locating the lands were to be borne equally by them. The money due the commissioners on their contract had been collected and was in the custody of their attorney, but subject to the control of the chancery court, from which the appeal had been prosecuted. It was alleged that Powell was to advance certain moneys deemed necessary to the execution of the joint enterprise, for which he was to be reimbursed out of the fund of twenty per cent., when collected from the state. The court said: "It is manifest that such an agreement, resting on contract made between the parties, would, if proved, constitute a lien or charge upon the fund in question, which would be in the nature of an equitable mortgage. All that is required to this end is that the intention of the parties, as deducible from the contract, be clear in its purpose to pledge the fund as a security for the debt created. Accordingly, an agreement that a debt shall be paid out of the proceeds of certain property, or that the property shall be bound for the debt, has been usually construed to create an equitable mortgage." [2] The term "equitable lien" has been characterized as "intensely unde-

fined." 19 A. & E. Ency. Law (2d Ed.) 12. "Broadly stated," said a writer on the subject, "every written contract which shows an intention to charge some particular property, therein described or identified, with a debt or obligation, creates an equitable lien upon such property. An equitable lien is also created by a written agreement to convey or transfer property as security for a debt or obligation. Such contracts will create a lien on personal property though only verbal." 19 A. & E. Ency. Law (2d Ed.) 13, 14. "The doctrine may be stated, in its most general terms," says Mr. Pomeroy (3 Pom. Eq. § 1235), "that every express agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for a debt or other obligation, or whereby the party promises to convey or assign or transfer the property as security, creates an equitable lien upon the property so indicated, which is enforceable against the property in the hands, not only of the original contractor, but of his heirs, administrators, executors, voluntary assigns, and purchasers or incumbrancers with notice. Under like circumstances, a merely verbal agreement may create a similar lien upon personal property." "In courts of equity the term 'lien,'" said the court in Fallon v. Worthington, 13 Colo. 568, 22 Pac. 962, 6 L. R. A. 711 (16 Am. St. Rep. 231), quoting from 1 Jones on Liens, § 28, "is used as synonymous with a 'charge' or 'incumbrance' upon a thing, where there is neither jus in re or ad rem, nor possession of the thing. The term is applied as well to charges arising by express engagement of the owner of the property and to a duty or intention implied on his part to make the property answerable for a specific debt or engagement." It is fair to assume that the mill company, if the court had not by its receiver taken charge of the administration of its affairs, would, as it had agreed it would do, have paid appellee's account for the goods furnished out of the proceeds of sales of lumber it had on hand at the time the receiver took charge of its property. In providing for the disbursement of the fund arising from the sale by its receiver of that lumber, it seems to us that the court made a proper disposition thereof when he directed that it should be used as all the parties concerned contemplated it would be used, and as, presumably, it would have been used but for the intervention of the receivership. Goodnough Mer. & Stock Co. v. Galloway (D. C.) 156 Fed. 510, s. c. (D. C.) 171 Fed. 940; Bank v. Higgins, 72 Tex. 67, 9 S. W. 745; Trust Co. v. Coal Co., 99 Iowa, 234, 68 N. W. 697; Jackson v. Rutherford, 73 Ala. 155; Howard v. Delgado, 121 Fed. 26, 57 C. C. A. 270.

The amount of appellee's account was $3,519.77. To this the court added interest thereon from January 1, 1910, to the date of

the judgment, making a total of $3,667.37, which he directed should be paid to appellee out of the funds in the hands of the receiver, before any part of same should be applied to the payment of appellants' claims. So far as the judgment is for interest on the account, we think it is erroneous.

[3] The general rule, as declared by the Supreme Court of the United States in Thomas v. Western Car Co., 149 U. S. 116, 13 Sup. Ct. 833, 37 L. Ed. 671, is that: "After property of an insolvent passes into the hands of a receiver or of an assignee in insolvency, interest is not allowed on the claims against the funds. The delay in distribution is the act of the law; it is a necessary incident to the settlement of the estate." Appellee insists that the trial court having found, and his finding not having been challenged by appellants, that appellants had agreed in open court that the amount due on the account, "including interest to date, is $3,667.-37," they should not be heard here to complain of the judgment in that respect. But we think this is not an answer to appellants' complaint.

[4] If the agreement recited by the court should be construed as an admission by them that appellee was entitled to recover interest on the account, it should not, we think, be construed as an admission that such interest was a charge on the funds held by the receiver entitled to priority of payment over their own claims. Appellee further insists, on authority of Bank v. Campbell, 114 S. W. 887, that the court properly held it to be entitled to recover interest on the amount of the account, and such interest to be also a charge on the funds held by the receiver. But we think that case to be distinguishable from this one. There, by express contract, the payment of both the principal sum and interest thereon was secured by property pledged to the creditor. The theory upon which we have held that the amount of appellee's account was entitled to priority of payment out of the funds in the hands of the receiver of the mill company is that all the parties concerned intended it to be a charge on those funds. [5] It cannot be said that appellants contemplated that interest would accrue on such claims as the one represented by appellee's account. On the contrary, it is fair to assume that they contemplated that such expenses as the mill company incurred in operating the mill would be paid practically as they accrued, out of funds arising from the sale of its products, which they had agreed should be devoted to that purpose.

Appellee in its brief suggests that, if we should reach the conclusion that it was not entitled to recover the interest allowed, the cause need not therefore be reversed. We agreed it need not be. The judgment will be so reformed as to adjudge a recovery in favor of appellee for the sum of only $3,519.77, the amount of its account; and, as so reformed, it will be affirmed. The costs of this appeal will be adjudged against the appellee.

## On Motion for Rehearing.

The judgment in appellee's favor on account of the notes sued on was for the sum of $7,828.48. In the motion attention is called to the fact that $771.40 of that sum represented interest which accrued on the principal of the notes after the appointment of the receiver. The correctness of the judgment in this particular was challenged by a proper assignment, which was overlooked by us when the appeal was first considered. There is nothing in the record suggesting a reason why the general rule announced by the Supreme Court in Thomas v. Western Car Co., 149 U. S. 116, 13 Sup. Ct. 824, 37 L. Ed. 663, as applicable in such cases, should not be applied here.

The motion for a rehearing, therefore, is granted. The judgment of the court below in appellee's favor will be further reformed so as to adjudge a recovery in appellee's favor on account of the notes for the sum of $7,057.08, instead of for the sum of $7,828.48, and, as so further reformed, it will be affirmed.