## GOODNOUGH MERCANTILE & STOCK CO. v. GALLOWAY et al.

(District Court, D. Oregon.   July 19, 1909.)

No. 4,851.

1. BANKRUPTCY (§ 303*)—EQUITABLE LIEN—EVIDENCE.

Evidence *held* to establish an agreement between complainant and a bankrupt that complainant should have security for advances of money and supplies to be made to the bankrupt from time to time to enable him to perform certain logging contracts, by a lien on the lumber manufactured and the proceeds thereof.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 462; Dec. Dig. § 303.*]

2. SALES (§ 235*)—BILL OF SALE—BONA FIDE PURCHASERS.

Bills of sale not properly acknowledged, and so not entitled to record, are invalid as against persons without notice, or innocent purchasers for value.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 684; Dec. Dig. § 235.*]

3. LIENS (§ 7*)—EQUITABLE LIENS.

An agreement between complainant and a bankrupt that complainant should have present security on the timber covered by certain logging contracts, the logs cut therefrom, and the lumber manufactured from the logs, in return for money and supplies advanced, to enable the bankrupt to complete his lumber operations, constituted an equitable lien, effective against all save purchasers for value without notice, under the rule that equity looks on things agreed to be done as actually performed.

[Ed. Note.—For other cases, see Liens, Cent. Dig. § 26; Dec. Dig. § 7.*]

4. BANKRUPTCY (§ 267*)—FUNDS OF ESTATE—EQUITABLE LIEN.

Where complainant had an equitable lien on timber and lumber manufactured by a bankrupt, the lien attached to a fund derived from a sale thereof in the hands of the bankrupt's trustee.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 380; Dec. Dig. § 267.*]

5. BANKRUPTCY (§ 198*)—ATTACHMENT LIEN—TERMINATION.

Where no attempt was made in a bankruptcy proceeding to reserve a prior attachment lien of a creditor for the benefit of the estate, as authorized by Bankr. Act July 1, 1898, c. 541, § 67f, 30 Stat. 565 (U. S. Comp. St. 1901, p. 3450), and no order of the bankruptcy court was made to that end, the lien was dissolved by the bankruptcy proceedings.

Dig. § 198.*]

6. BANKRUPTCY (§ 207*)—ATTACHMENT—PRESERVATION.

Bankr. Act July 1, 1898, c. 541, § 67f, 30 Stat. 565 (U. S. Comp. St. 1901, p. 3450), authorizing the preservation of an attachment lien for the benefit of the estate, was designed only to preserve some interest acquired by virtue of the attachment which would not otherwise pass to the bankrupt's trustee by virtue of the proceedings.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 207.*]

7. BANKRUPTCY (§ 155*)—INTEREST OF TRUSTEE.

A trustee in bankruptcy takes the bankrupt's property in cases unaffected by fraud in the same condition that the bankrupt held it, and subject to the equities thereon in the bankrupt's hands, except where there has

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes·

been a conveyance or incumbrance void as against the trustee by some express provision in the act.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 155.*]

8. BANKRUPTCY (§ 177*)—BILLS OF SALE—PRIOR EQUITABLE LIEN.

Bills of sale, assignments, etc., executed by a bankrupt within four months prior to the filing of the bankrupt's petition, but to carry into effect a prior agreement for security for advances and supplies made more than eight months prior to the filing of the petition, were not void because made within four months of the bankruptcy adjudication.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 263; Dec. Dig. § 177.*]

9. FRAUDS, STATUTE OF (§ 72*)—"INTEREST IN LAND"—TIMBER CONTRACTS.

A contract for the sale of standing timber, contemplating separation from the soil within a reasonable time, without any stipulation for the beneficial use of the soil, but with a mere license to enter and take them away, is not a sale of an "interest in land" within the fourth section of the statute of frauds, but is a sale of goods only.

[Ed. Note.—For other cases, see Frauds, Statute of, Cent. Dig. § 117; Dec. Dig. § 72.*

For other definitions, see Words and Phrases, vol. 4, p. 3700; vol. 8, p. 7691.]

10. FRAUDS, STATUTE OF (§ 63*)—TIMBER CONTRACTS—ASSIGNMENT.

Assignment of timber contracts, contemplating a removal of the timber within a reasonable time, need not be by deed.

[Ed. Note.—For other cases, see Frauds, Statute of, Cent. Dig. § 100; Dec. Dig. § 63.*]

See, also, 156 Fed. 504.

Ramsey & Oliver, for complainant.

J. D. Slater, for defendants.

WOLVERTON, District Judge. This is a suit for establishing a lien upon certain alleged trust funds now in the hands of the trustee in bankruptcy, and also upon certain timber contracts which have been heretofore assigned to the complainant. The facts, about which there is no dispute or controversy, are as follows:

On September 27, 1901, Jackson Lewis sold, under written contract, to one G. W. Buck, all standing saw timber of certain specified dimensions contained upon certain premises comprising 160 acres, with the right of possession of such premises for five years for logging purposes, and the removal of the timber; and on the same date Albert Lewis, by a similar contract, sold to Buck the standing saw timber contained upon a certain other tract of land, comprising also 160 acres. On May 2, 1903, both these contracts were assigned, by separate writings, by Buck to the complainant.

On January 31, 1903, Buck executed and delivered to complainant the following writing:

"This is to certify that I have this day sold to G. M. & S. Co., of Elgin, Or., 1,588 logs, 332,100 feet of good merchantable timber, decked up on skidways at my sawmill, 8 miles N. W. of Elgin, at $2.50 per M—$830.25. For which I have received value in mdse. supplies furnished my men. This sale is given as collateral security for advances made.      G. W. Buck.

"Witness: J. H. Compon."

And on February 28, 1903, another writing, as follows:

"This is to certify that I have this day sold to G. M. & S. Co. 145,660 ft. logs 677 @ $2.50 per M—$364.15. Given as collateral security on a/c. The same being decked in my millyard at the sawmill. G. W. Buck.
"Witness: T. E. Smith."

This instrument bears date as of the year 1902, but the true date is 1903. Both these instruments were filed for record in the recorder's office for Union county on April 7, 1903.

On January 23d Buck entered into a contract with the Elgin Lumber Company, whereby he agreed to sell to said company 4,000,000 feet of lumber, the output of his mill, at prices stated, according to the quality of the lumber; the lumber to be delivered by Buck into the lumber yard of the second party at Elgin, Or. Indorsed upon the back of this contract is the following, bearing date April 16, 1903:

"Gentlemen: Please pay to the Goodnough Merc. & Stock Co. all money on the within contract, and I will make settlement with them. G. W. Buck."

The defendant Cecil Galloway is the trustee in bankruptcy of G. W. Buck. The bankruptcy of Buck was involuntary, the petition having been filed on the 22d day of May, 1903; and the adjudication was had June 13, 1903. On the 7th day of May, 1903, the Bank of Elgin, in an action instituted in the circuit court of the state of Oregon for Union county against Buck, attached all his right, title, and interest in and to all the lumber and logs then on the latter's sawmill yard, and all the logs cut and then in the timber, and also the timber contracts with Jackson and Albert Lewis. The sawmill was incumbered with a first chattel mortgage in favor of one Jesse Hindman, and with a second mortgage of like character in favor of the First Bank of Elgin. These mortgages were for a larger amount than the mill and property covered were worth. Buck also had a contract with one George Smittle, entered into in September, 1902, whereby he purchased of Smittle the standing saw timber upon a certain other tract of land; but this contract is not involved in the present controversy. Buck's sawmill was erected upon the premises of Albert Lewis, as described in the said timber contract with him. On April 16, 1903, Buck executed to complainant his promissory note for the sum of $3,850, covering advances made to Buck in the way of money to assist him in cutting logs from the timber, hauling the same to the mill, and manufacturing them into lumber, and also in the way of supplies furnished to Buck and his employés from complainant's store during the period subsequent to September 1, 1902. On May 6, 1903, complainant and Buck had an accounting for money and supplies furnished in like manner from April 16th to that date, whereby it was found that the additional sum of $390.33 was then due from Buck to complainant. Subsequent to Galloway's appointment as trustee in bankruptcy of the estate of Buck, he sold the logs and timber which Buck had on hand at the time of the institution of bankruptcy proceedings against him, and received therefor the sum of $2,873. Out of this sum Galloway has paid the claims of laborers amounting to the sum of $705.57, leaving in his hands a balance of $2,167.43. This is the fund upon which complain-

ant claims a lien, as well as upon the Jackson and Albert Lewis timber contracts.

The real contention here is concerning the nature of complainant's agreement with Buck, whereby that company claims a lien upon the fund, and whether it was sufficient in legal contemplation to impose any lien thereon or upon the timber contracts of the Lewises. This necessitates a careful review of the testimony bearing upon the subject.

G. W. Buck testifies, as questioned, as follows:

"Q. Were you engaged in the sawmill business there from about the first of September, 1902, until sometime in May, 1903? A. I was.

"Q. State whether or not you made any contract with the plaintiff about the 1st day of September, 1902, with reference to furnishing you supplies and money, etc., to assist you in carrying on the sawmill business, and, if you made any such contract, state as nearly as you can what the contract was? A. Yes, I made such an arrangement. The arrangement I made was furnishing supplies and money when it was needed to pay for help in moving my mill from the old site to the new site and for manufacturing the lumber the coming season.

"Q. Who was to furnish these supplies when needed? A. The Goodnough Mercantile & Stock Company.

"Q. To whom were these supplies and money to be furnished? A. To me, for the purpose of altering the sawmill.

"Q. Did you at that time have any means of your own with which you could carry on such business? A. None to speak of.

"Q. Did you run the mill under that arrangement between the 1st day of September, 1902, and some time in May, 1903? A. I did.

"Q. State what the fact is as to whether or not the plaintiff was to furnish you money and supplies to pay for cutting and hauling logs and also to pay the expense of manufacturing those logs into lumber under the contract. A. Yes.

"Q. Did you at the time you made that arrangement with the plaintiff own and hold any contracts for purchase of timber and leases? A. I did.

"Q. State what the agreement was between you and plaintiff made 1st of September, 1902, with reference to your paying them or repaying them what they agreed to furnish you to carry on this sawmill business. A. The arrangement was that they were to have securities on the logs sawed and in the timber and on the logs in the millyard and on the lumber when it was manufactured.

"Q. They were to have security for what? A. For supplies and money furnished in manufacturing the same.

"Q. Was there anything said in the contract or arrangement to which you referred as to their having or not having a lien on timber that you had contracted for to secure them for their advances made to you in this contract? A. They was to have security on the standing timber which I had on a contract for all moneys furnished to pay for same.

"Q. Did this lien on the timber apply only to the moneys furnished to pay for timber, or did it apply on supplies furnished to carry on the sawmill business? A. Timber and supplies; the security on the timber was to be given for supplies and money furnished to pay for the timber or labor.

"Q. When you say that the plaintiff was to have security on the timber, logs, and lumber, what do you mean by the word 'security'? A. They were to have the lien on it or a bill of sale to secure them for the money advanced.

"Q. How, according to this contract, were they to get their money out of property upon which was the lien or security? A. It was supposed to be manufactured in the lumber, and I had a contract for about 3,000,000 feet of lumber to be delivered to the Elgin Lumber Company at Elgin, Or., and this contract was assigned to G. M. S. & Co. and whenever payments were due on same they was to collect the money to the amount of my indebtedness to them at any time or other, supposed to be at the end of each month, after commencing sawing."

After stating that the bills of sale, being the writings of date January 31 and February 28, 1903, heretofore alluded to, and recorded in the recorder's office, were made to secure complainant for advances, he further testifies:

"They were made with the intention of carrying out the original plan or contract of giving security for what I got."

The witness disclaimed any intent or purpose through such arrangement to secure the complainant for advances to hinder, delay, or in any manner defraud his creditors. On recross-examination, witness further states:

"A. These sales or assignments were made from time to time to corroborate any former contract or agreement which might not be in proper form.

"Q. Then, if I understand you, your contract with plaintiff was, in substance, that you would from time to time secure them for these advances by giving them such bills of sale or assignments as they might require, and that in conformity with that agreement and at their request you executed and delivered these bills of sale, the promissory note, and the assignment of these contracts? A. That is correct."

And on redirect examination:

"Q. Wasn't it in accordance with the original contract made September, 1902, that the plaintiff was to have security or a lien upon the standing timber logs cut, and the lumber manufactured, to secure them for any money or supplies they should furnish you under that contract. A. Yes, it was."

On recross-examination the witness further states that these assignments and contracts were subject to their demand at any time, whenever they asked it, after September of 1902.

W. I. Dishman, the vice president of the Goodnough Mercantile & Stock Company, testifies:

"Q. State what contract, if any, was made by your company plaintiff and the defendant G. W. Buck with reference to the company's furnishing money and supplies to G. W. Buck. A. Well, we entered a contract that we were to have all the security that he could give us in the way of contracts, timber contracts, and security, as I thought a second mortgage on the sawmill, knowing that Jesse B. Hindman had a first mortgage, and he was to contract his lumber if possible and turn us the contract as security.' If he failed to contract his mill cut of the year 1903, we were to take the lumber, sell it, and protect Jesse Hindman with as we supposed 25 cents a thousand on the mill cut, as we had the year before, 1902, and take our pay, and Mr. Buck was to have the remainder, the way I understood it.

"Q. What was he to secure you for? A. We were to have security for furnishing him money and supplies to run his sawmill.

"Q. Now, please state what your company agreed to do for him and what he agreed to do with the way of security. A. He agreed to give us all of the security that he had on our demand. We agreed with him that we would furnish him supplies and what necessary money that he would have to have to run his sawmill, with the understanding that he was to get the same contract with the Elgin Lumber Company that he had the year before if possible, and that we were to take Jesse Hindman in so much a thousand for the use of the mill. Didn't know how much that would be. Of course, it would be about 25 cents a thousand, what we paid the year before.

"Q. What were you to have security on, if anything, for your advances? A. We were to have security on those timber contracts, the contracts for lumber, providing he could get one, and a mortgage on the mill, and we were to have, the best I recollect, I don't believe there was any personal property mentioned, I wouldn't say, I think there wasn't. He had a little personal security, but I don't think it was mentioned.

"Q. Well, what is the fact as to your having or not having a lien or security upon all the logs cut and the lumber cut by this party if anything? A. He was to give us a bill of sale of logs, and lumber as on our demand at any time that we asked for it, what logs and lumber he had.

"Q. What did he give you the bill of sale for? A. It was for security for money supplies furnished on the contract."

### The witness continues:

"A. According to our contract in September, Mr. Buck was to turn any contract that he could make with any parties over to us at our approval if the contract suited us as security on furnishing him money supplies to run his mill.

"Q. Now state, if you can, why this order on the back of this contract, being plaintiff's Exhibit No. 1 plaintiff's proofs, was made to your company? A. Well, it was signed and turned over to us as security for supplies and money furnished Mr. Buck according to contract in September as security on contracts.

"Q. If you know, state for what purpose Exhibit No. 4 of plaintiff's proofs, being a bill of sale dated January 31, 1903, by G. W. Buck, was made? A. Best of my recollection when we entered into this contract that Mr. Buck was to give us the bill of sale of all the logs that was put in the yards at winter, the fall and winter. I told Frank Smith one day that I hadn't seen any security on that contract; told him that he better look after it. He told me that he had seen Mr. Buck, and that Mr. Buck had given him a bill of sale for the timber and logs. The first time I saw that contract was just now. I had just looked at it.

"Q. If you know for what purpose bill of sale by G. W. Buck to your company dated February 28, 1902, the true year being, as Mr. Buck explained, 1903, for saw logs, being Exhibit No. 5 of plaintiff's proofs, was made, please state for what purpose it was made. A. It was made for security. I seen Mr. Buck and told him I wanted him to fix it up according to contract.

"Q. You have stated that you were given security. Please state what the security was for. A. It was given as security on contract entered in with Mr. Buck in September for supplies and money that we had furnished to him to run his sawmill or logging camp."

### A little later the witness further testifies:

"Q. State if you know for what consideration the assignment of the Jackson Lewis contract and lease, being Exhibit No. 2 plaintiff's proofs herein, was made to your company. I refer to written assignment dated May 2, 1903, written on said Exhibit No. 2. A. It was assigned, turned over to the company as security for supplies and money furnished Mr. Buck on contract made in September, at our demand.

"Q. State for what purpose the Albert Lewis timber contract and lease, being Exhibit No. 3 plaintiff's proofs herein, was assigned by said G. W. Buck to your company. I refer to the assignment in writing on said contract dated May 2, 1903. A. It was turned over to us as security for supplies furnished Mr. Buck and money on contract made in September, 1902, with Mr. Buck.

"Q. In the contract to which you have testified made between your company and G. W. Buck about September 1, 1902, was there anything said or understood between the parties hereto as to whether or not your company should have a lien on said timber contract that Buck had with the Lewises and on any logs that might be cut and lumber manufactured therefrom? If so, state what was said or agreed in regard thereto. A. Mr. Buck was to turn over those timber contracts, give us a bill of sale, logs, and give us bill of sale of that lumber that was cut at our demand any time.

"Q. Under your contract with Mr. Buck, made in September, 1902, was he to have the right to sell any lumber or any of the logs or any of that timber without your approval or consent? A. He was not."

### The witness further testifies on cross-examination:

"A. My contract, or our contract rather, with Mr. Buck along about September 1, 1902, was that we was to have all the lands on the standing timber,

sawlogs, and lumber as they was cut into lumber and all the property that he had, mill and all. We were to hold the liens on that property, and Mr. Buck was to make us over these timber contracts and bills of sale and sawmill as· security on these, on this money and goods that we were furnishing him from the date of September 1st, as security to secure the liens on all this property, and he was to do it at our request any time.

"Q. At any time you demanded this kind of security for advancements you had made or were to make he agreed to give it you? A. He give it to us right then. It was the understanding that we have a lien on all the property, all of it, from that date.

"Q. Well, now, you say this was the understanding? A. It was the contract.

"Q. Or the contract, please state the conversation you had as nearly as you can remember it word for word, with Mr. Buck, including what he said, the exact language he used, and what you said, the exact language you used as nearly as you can remember it, not including anything told you by Smith, or anybody else. A. Well, Mr. Buck and I had a conversation. He came to me and asked me in regard to moving his sawmill, and I asked him what security that he had to secure us in helping him move his sawmill, and he told me that he didn't know how much he would need in moving, how much money he would need in moving his mill, as he hadn't got all his lumber in from the old shedding, and that he would need a little assistance he thought, and that he would want some assistance to run his mill and get in logs, etc. After he had moved there, and asked in a general way what help he could get, then he went on to tell me he give us a lien on the timber on the Lewis lands, those lands on his, on all his property, his sawmill, the whole thing, I rather think I asked him what it was, I ain't sure as to what he said about it, as to what it was, those timber contracts I recollect that very well and the sawmill, and I rather thought there was something said about some horses and cows. I ain't sure about that.

"Q. Among other things, he was to give you a second mortgage on the sawmill, I believe you ·testified? A. I asked Mr. Buck that question, and he told me that if he was going to pay Jesse Hindman's mortgage off that year, and he said that he didn't hardly think he could, but he could make arrangements with Jesse to carry that over, I don't know what amount it would be, naturally supposing that we would have a lien on the mill."

Perhaps a clearer ·statement of the alleged agreement for a lien is made by Frank E. Smith, who was secretary of the complainant company. He testifies as follows:

"Q. State what contract was made, if you know, between the plaintiff in this action and G. W. Buck about the 1st day of September, 1902, in relation to plaintiff's furnishing supplies or money to Buck to enable him to carry on the sawmilling business. A. Well, along about the last of August or first of September, Mr. Buck asked us if we would furnish him supplies and money to move his mill and cut logs and lumber for the coming season. He said that he had some lumber left at his old setting. ·He bought the timber from the Lewises. Said he would turn us over the lumber, that he had left from the old setting, that was going to the Elgin Lumber Company, on the old contract, and for the supplies and money furnished he would give us security on the logs and the timber land that he had got from the Lewises, and the timber that would go into the mill.

"Q. What did the plaintiff do with reference to his offer as to accepting it or not? A. It was agreed that it would be done in that way.

"Q. What was there said ·in that agreement, if anything, with regard to plaintiff's having or not having any lien upon the lumber that should be manufactured from the timber? A. Along with the agreement was the condition that Mr. Buck was, if possible, to sell his lumber to the Elgin Lumber Company, as he had done the year before, and that if that contract that he would make was acceptable G. W. Buck was to turn the proceeds of that contract to us, and if not we would handle the lumber ourselves or in some other manner.

"Q. Under the contract between Buck and the company, was he to have the absolute right to sell the property without the consent or approval of the company or not? A. Why, the understanding was that any contract that he made that we considered safe and that there was a fair margin of profit would be acceptable, to us.

"Q. Under the contract referred to, to whom were the proceeds of the sale of lumber to be paid? A. Under the contract the money was to be turned over to us.

Q. State what the fact is as to whether or not that Buck and plaintiff company went ahead and operated under that contract. A. We did.

"Q. How much did the plaintiff company advance in the way of money and supplies and furnish money under said contract between the 1st day of September, 1902, and the 7th day of May, 1903, if you know? A. $5,188.74, it figures out.

"Q. How much of that did Mr. Buck pay during that time, and how did he make payments? A. He paid $948.41. There was some ties turned in, and there was one payment of $680 coming from the sale of his lumber he had at his old setting, and he sold us I think 12 lots. There was a credit there of $165.60. There was some aggregate amounts that made the total $948.41. The amounts were credited between September 1st and May the 7th.

"Q. What balance does that leave due from G. W. Buck to the company? A. It made a total balance of $4,240.33. He had given us a note for $3,850, along about the middle of April, and the book balance above that note on May the 7th was $390.33.

"Q. This payment made as the proceeds of lumber to which you have referred, was for lumber that he cut prior to September 1, 1902, was it not? A. Yes, it was cut before September 1st.

"Q. Under the contract between the plaintiff and G. W. Buck to which you have testified, was the lien the plaintiff was to have on the property of said G. W. Buck to extend to all the logs and lumber that he would have at the mill during the season of 1903, or did it extend only to a part? A. It extended to everything that would be cut that season.

"Q. Were you present at Elgin when Mr. G. W. Buck made a written assignment of the Albert Lewis contract and lease, and the Jackson Lewis contract and lease, which are marked Exhibits No. 3 and 2 of plaintiff's proofs herein; said written assignments on said contract bearing date of May 2, 1903? A. I was at Elgin at the time.

"Q. Were you present when these two timber contracts with the written assignments thereof were delivered by Buck to plaintiff company, if they were delivered? A. I think they were delivered to Mr. Dishman.

"Q. Were you there when it was done? A. Yes, I was at Elgin when it was done.

"Q. Do you know for what purpose Mr. Buck assigned these two timber contracts to the plaintiff? A. It was in fulfillment of his contract made along about the 1st of September in regard to security to be given us.

"Q. Do you know for what purpose or what security the two bills of sale that have been referred to in your examination were made and delivered by G. W. Buck to the plaintiff company? A. They were made in fulfillment of his contract which was made about the 1st of September for security for money and supplies furnished.

"Q. State, if you know, for what purpose the order was made by G. W. Buck to the Elgin Lumber Company, to pay the money on the money to be due on the Elgin Lumber contract, marked Exhibit No. 1 of plaintiff's proofs herein, being the written order indorsed on said Elgin contract bearing date of April 16, 1903. A. That was also in fulfillment of his contract made in September."

## And on cross-examination the witness further testifies:

"Q. All these bills of sale, assignments of contracts, and the execution of this promissory note were in fulfillment of the contract you made with Mr. Buck in September, 1902, were they not? A. Yes, according to the agreement made at that time.

"Q. In other words, at that time it was agreed between you people and Mr. Buck that he should give you such security at any time you demanded? Is that what you mean, by these assignments and bills of sale having been executed and delivered in fulfillment of the contract? A. Partially so. His contract called for him furnishing us security on the lumber and logs and the standing timber for what material and supplies and cash we furnished as his work progressed, and whenever he made a contract for his lumber that contract was to go to us, and the money was to be received on that contract for the sale of his lumber to liquidate his account with us.

"Q. And in fulfillment of that agreement you had him execute to you, or he did execute and deliver to you, the assignment of the contract with the Elgin Lumber Company for the sale of his lumber and of the two Lewis contracts and the two bills of sale, that are all in evidence as exhibits in this case? A. Yes, sir."

And further:

"Q. Is it not a fact, Mr. Smith, that at about the time you secured these bills of sale and the assignment of this lumber contract with the Elgin Lumber Company, that you had learned by investigation and talks with other creditors of defendant Buck that he was liable to have trouble, and that these bills of sale and the assignment of this lumber contract were taken for the purpose of securing yourselves against what you considered the probable attempts of other creditors to get their claims? A. It was done in accordance with the agreement and contract. We had been paying creditors right along for what he owed them, and we knew that there were no others only Jesse Hindman and the First Bank of Elgin, and they were secured with a mortgage on the mill. There was no talk of other creditors giving any trouble whatever."

From this testimony—and there is nothing in the record to counteract it—I think it appears, not so definitely as it might, but with sufficient precision, that the understanding and agreement between Buck and the complainant company was that the complainant should have security for the advances in money and supplies, which it agreed to make from time to time as needed by Buck, and that that security should consist in the timber contracts, the logs cut from the timber, and the lumber manufactured from the logs. The mill was also included with the other property. It was subsequently ascertained, however, that the mill was mortgaged to Jesse Hindman and the Elgin Bank for as much as it was worth, and was therefore worthless as additional security, and no further attention was paid to that property by the complainant. There is a suggestion that the purport of the agreement was that the security should be given when asked for, in the future, as the occasion might arise; but the better interpretation seems to be that it was agreed that the complainant should then have security upon the property designated, and that the future transfers and assignments should follow in pursuance of such agreement, and in furtherance thereof. It was upon that consideration alone that the company agreed to make the advances to aid Buck in carrying on the mill business; otherwise Buck would have been unable to cut the logs and manufacture the lumber, the proceeds of which constitute the especial subject of this litigation. The subsequent conduct and acts of the parties point to this understanding of the agreement as the one intended.

On January 31, 1903, the bill of sale was given upon certain logs, and on February 28th following another bill of sale was executed with the apparent purpose of carrying into effect the original agreement.

It developed later that these bills of sale were not properly acknowledged, and hence were not entitled to record, so that, as to third parties without notice of their existence, or innocent purchasers for value, they were without effect as an incumbrance upon the property described; but, what is more significant, it was agreed at the time that Buck should not sell or dispose of any of the lumber without the approval of the Goodnough Mercantile & Stock Company. Later, on January 23d, a contract was entered into with the Elgin Lumber Company for the purchase by that company of the output of the lumber from Buck's mill. This did not meet with the approval of the Goodnough Mercantile & Stock Company until there was a modification by the Elgin Company agreeing to pay an advance of $1 per 1,000 on certain kinds of the lumber covered by the contract. Later, when the adjustment was made, to wit, on April 16th, an order was indorsed upon the contract to pay the Goodnough Mercantile & Stock Company all money falling due from deliveries of lumber under its terms. Somewhat later the two timber contracts were assigned to the complainant, and, as witnesses say, in pursuance of the original agreement on the part of Buck to secure the complainant for the advances of money and provisions to Buck and his employés, to enable Buck to carry on the logging and milling business.

It should be remarked that, at the time the principal agreement was entered into, the logs had not been cut, or at least in large proportion, nor was any of the lumber manufactured; but Buck possessed a potential interest therein, having the timber contracts. The complainant's reimbursement was to come from the proceeds of the product of the timber, so that the contract appears to be a perfectly natural one to make under the circumstances; Buck being otherwise involved. Aside from this, there is a positive equity in the idea that complainant should be secured in its advances, which enabled Buck to produce the logs and lumber, the proceeds of which now constitute the subject of controversy. The agreement that the Goodnough Mercantile & Stock Company should have security—that is, a present security upon the property—constituted an equitable lien, which attended the property, the timber in the tree, the logs cut therefrom, and the lumber manufacured from such logs, and was effective against all others, save such as might have purchased for value, without notice or knowledge of the existing contractual relations between Buck and the complainant. "Equity looks upon things agreed to be done as actually performed." Buck having agreed that the complainant should be secured for the advances upon certain and definitely specified property, equity will, for the purpose of making the contract effective, deem that the security was actually given, and so treat the transaction. By virtue of the agreement therefore the complainant acquired an equitable lien upon the property designated, and that lien attends the fund in the hands of the trustee in bankruptcy unless displaced by the attachment proceeding inaugurated by the First Bank of Elgin, or in some way by the bankruptcy proceedings. See Hauselt v. Harrison, 105 U. S. 401, 26 L. Ed. 1075, and the decision rendered in the case at bar, on demurrer to the bill. (D. C.) 156 Fed. 504.

Much testimony has been adduced with a view to showing that the First Bank of Elgin had notice of the agreement between Buck and complainant, whereby the latter was accorded a lien upon the property concerned; but that inquiry is rendered irrelevant on account of the dissolution of the attachment following the assignment in bankruptcy. Section 67f of the act of bankruptcy (Act July 1, 1898, c. 541, 30 Stat. 565 [U. S. Comp. St. 1901, p. 3450]) is effective to so dissolve the attachment. There is provided in that subdivision a method whereby the lien of attachment may in proper cases be preserved for the benefit of the estate. This may be done by order of the court on due notice. No attempt, however, was made in the bankruptcy proceeding to so preserve the attachment lien of the bank for the benefit of the estate, and no such order of court has been made within the purview of the act, and hence it cannot be insisted that the attachment lien still exists for any purpose. The statute was designed to preserve some interest acquired by virtue of the attachment, which would not pass to the trustee by virtue of the bankruptcy proceeding. To illustrate, it is said in Thompson v. Fairbanks, 75 Vt. 361, 56 Atl. 11, 104 Am. St. Rep. 899:

"If there is no other lien on the property, there can be no occasion for such order, for, on the dissolution of the attachment, the property, unless exempt, would pass to the trustee anyway. It is only when the property for some reason may not otherwise pass to the trustee as a part of the estate that such order is necessary."

If the property passes at any rate to the trustee, there is no necessity for invoking the order of the court. The attachment being dissolved, the trustee is not further embarrassed in his settlement of the estate. It is therefore for preserving some interest that the attaching creditor has acquired for the benefit of the estate, that would not otherwise pass to the trustee, that the court's order may be brought into requisition. First National Bank v. Staake, 202 U. S. 141, 26 Sup. Ct. 580, 50 L. Ed. 967. Such is not the case at bar, as the property passes to the trustee in any event, whether there was a previous attachment of it or not.

The next inquiry is whether the trustee in bankruptcy takes by any better or superior right or title than the bankrupt possessed immediately preceding the assignment. This question has become finally settled by recent decisions of the Supreme Court. In Thompson v. Fairbanks, 196 U. S. 516, 526, 25 Sup. Ct. 306, 310, 49 L. Ed. 577, the court uses this language:

"Under the present bankrupt act, the trustee takes the property of the bankrupt, in cases unaffected by fraud, in the same plight and condition that the bankrupt himself held it, and subject to all the equities impressed upon it in the hands of the bankrupt, except in cases where there has been a conveyance or incumbrance of the property which is void as against the trustee by some positive provision of the act."

The principle is strongly reaffirmed in York Manufacturing Co. v. Cassell, 201 U. S. 344, 26 Sup. Ct. 481, 50 L. Ed. 782, where the later authorities are cited. See, also, Hewit v. Berlin Machine Works, 194 U. S. 296, 24 Sup. Ct. 690, 48 L. Ed. 986.

It should be observed that the two bills of sale and the assignments

of the timber contracts, as well as the lumber contract by Buck to the Elgin Lumber Company, and the indorsement of the order thereon requiring the payment of the price of the lumber sales to the complainant, were all made within four months of the filing of the petition in bankruptcy. These were all made, however, in pursuance of the original contract or agreement under which the complainant advanced the money and supplies, which was entered into more than eight months prior to the filing of said petition. These bills of sale, assignments, and the lumber contract and the indorsement thereon, were not therefore void as being made within four months of the assignment in bankruptcy. Sabin v. Camp (C. C.) 98 Fed. 974; Thompson v. Fairbanks, supra.

Incidentally, the question has been presented whether the right to cut and remove standing timber is an interest in land which must be transferred by deed. In regard to the question, "it is now very generally recognized," say the authors of the American & English Encyclopedia of Law (volume 28, p. 541), "that a contract for the sale of trees, if the vendee is to have the right to the soil for a time for the purpose of further growth and profit, is a contract for an interest in land, but that where the trees are sold in the prospect of separation from the soil immediately or within a reasonable time, without any stipulation for the beneficial use of the soil, but with license to enter and take them away, it is regarded as a sale of goods only, and not within the fourth section of the statute."

Under this rule the timber contracts were subject to assignment without the observance of the formalities of a deed.

It follows from these considerations that the decree must be for complainant for the balance of the fund arising from the sale of the logs and lumber now in the hands of the trustee, after deducting the amount expended for labor claims; and it will be further decreed that the complainant has a lien upon the Jackson and Albert Lewis timber contracts, which should be sold to satisfy its demands.